IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| GREGORY SWEET, *on behalf of himself and others similarly situated*, | |
| Plaintiffs, | CIVIL ACTION FILE NO. |
| v. | |
| CLEARSIGNAL NETWORKS LLC; CLEARSIGNAL NETWORK SOLUTIONS, INC.; ROBERT HENRY; and JUDY GORDON HENRY, | |
| Defendants. | |

## **COMPLAINT**

Named Plaintiff Gregory Sweet brings this action for damages and other relief on behalf of himself and others similarly situated, by and through undersigned counsel, for failure to pay minimum and overtime wage rates as required by the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*, ("FLSA") and states and alleges:

## THE PARTIES

1.     Named Plaintiff Gregory Sweet ("Named Plaintiff") resides in Atlanta, Georgia.

2.     Defendant ClearSignal Networks LLC ("Defendant CSN") is a domestic Georgia corporation with offices in Georgia located at 1755 The Exchange, Marietta, Georgia 30339.  As listed with the Georgia Secretary of State, Defendant CSN's principal offices are located at 10524 Greenspring[s Drive], Tampa, Florida 33626.

3.     Defendant ClearSignal Network Solutions, Inc. ("Defendant CSN Solutions") is a Florida corporation with principal offices located at 8591 West Linebaugh Avenue, Tampa, Florida 33625.

4.     Defendant CSN may be served with process by delivering a copy of the complaint and a summons to its Registered Agent, Mary Jones, whose address is listed with the Georgia Secretary of State as 2704 Horseshoe Creek Marietta, Georgia 30064, to its corporate officers, or to Defendant CSN Solutions in accordance with Paragraph 5 of this complaint.  Fed.R.Civ.P. 4(h).

5.     Defendant CSN Solutions may be served with process by delivering a copy of the complaint and a summons to its Registered Agent, Judy Gordon Henry, whose address is listed with the Florida Secretary of State as 8591 West Linebaugh

Avenue, Tampa, Florida 33625, to its corporate officers, or to Defendant CSN, in accordance with Paragraph 4 of this complaint.  Fed.R.Civ.P. 4(h).

6.     On information and belief, Defendant Robert Henry ("Defendant Henry") is the president and co-owner of Defendant CSN.

7.     On information and belief, Defendant Henry is the president and co-owner of Defendant CSN Solutions.

8.     Defendant Henry may be served with process personally at his home address, at the offices of Defendants CSN or CSN Solutions, or wherever he may be found.  Alternatively, Defendant Henry may be served with process by leaving a copy of the complaint and a summons with someone of "suitable age and discretion" residing at his home address.  Fed.R.Civ.P. 4(h).

9.     On information and belief, Defendant Judy Gordon Henry ("Defendant Gordon") is the vice president and co-owner of Defendant CSN.

10.     On information and belief, Defendant Judy Gordon Henry ("Defendant Gordon") is the vice president and co-owner of Defendant CSN Solutions.

11.     Defendant Gordon may be served with process personally at her home address, at the offices of Defendants CSN or CSN Solutions, or wherever she may be found.  Alternatively, Defendant Gordon may be served with process by leaving

a copy of the complaint and a summons with someone of "suitable age and discretion" residing at her home address. Fed.R.Civ.P. 4(h).

## JURISDICTION & VENUE

12.    The Court has original jurisdiction over the claims stated herein pursuant to 28 U.S.C. § 1331.

13.    The companies owned and operated by Defendants, including but not limited to Defendants CSN and CSN Solutions, are a unified operation under the common control of Defendants for the common business purpose of selling telecommunications products and services to businesses ("CSN Enterprise").

14.    At all relevant times, Defendants owned and operated the CSN Enterprise, which has been and continues to be engaged in interstate commerce and/or the production of goods for commerce within the meaning of the FLSA.

15.    At all relevant times, Defendants have been "employers" engaged in interstate commerce.

16.    At all relevant times, Defendants have employed Named Plaintiff and others similarly situated, all of whom were engaged in commerce and/or the production of goods for commerce.

17.    At all relevant times, on information and belief, Defendants' CSN Enterprise has had at least $500,000.00 in "annual gross volume of sales made or business done."  29 U.S.C. § 203(s)(1)(A).

18.    Named Plaintiff and others similarly situated are individuals who have been employed by Defendants and have been paid as independent contractors to sell telecommunications products and services within the three years prior to the filing of this lawsuit and continuing through the duration of this action ("Salespeople").

19.    Named Plaintiff has consented in writing to be a party to this action pursuant to 29 U.S.C. § 216(b).

20.    A true and correct copy of Named Plaintiff's signed consent form is attached as Exhibit A.

21.    Other Salespeople have expressed interest in joining this lawsuit.

22.    For example, Pierre Brown, Pamela Rooks, Tausha Saxton, and Morgan Stovall have each consented in writing to be a party to this action.

23.    A true and correct copy of the consent form signed by Pierre Brown is attached as Exhibit B.

24.    A true and correct copy of the consent form signed by Pamela Rooks is attached as Exhibit C.

25.    A true and correct copy of the consent form signed by Tausha Saxton is attached as Exhibit D.

26.    A true and correct copy of the consent form signed by Morgan Stovall is attached as Exhibit E.

27.    As the case proceeds, other Salespeople will likely sign consent forms and seek to join this action.

28.    Pursuant to 28 U.S.C. § 1391 and Local Rule 3.1(B)(1)(a), venue is proper in this Court because a substantial portion of the events giving rise to the claims of Named Plaintiff and others similarly situated occurred within the Atlanta Division of the United States District Court for the Northern District of Georgia.

**FACTS SHOWING THAT DEFENDANTS ARE JOINT EMPLOYERS**

29.    On information and belief, Defendants Henry and Gordon jointly own the CSN Enterprise.

30.    On information and belief, Defendants Henry and Gordon jointly operate the CSN Enterprise.

31.    On information and belief, at all times relevant to this action, Defendant Henry directly and indirectly controlled, determined, and directed the day-to-day operations of the CSN Enterprise, including those conducted in the Georgia and Florida Offices.

32.     On information and belief, Defendant Henry directly and indirectly determined the payroll and compensation practices for the CSN Enterprise.

33.     Defendant Henry was responsible for the practice of classifying Salespeople as independent contractors for purposes of payroll.

34.     Defendant Henry determined the commission rates paid to Salespeople.

35.     Defendant Henry was responsible for the payroll policy of paying a base amount twice per month regardless of whether that amount met the minimum wage requirement for each week Salespeople worked.

36.     On information and belief, Defendant Henry directly and indirectly determined the scheduling, disciplinary policies, job descriptions, and other employment practices of the CSN Enterprise.

37.     For example, Defendant Henry required employees to pay late fees if they arrived late to their scheduled shifts.

38.     Defendant Henry was responsible for the scripts to be used by Salespeople when communicating with customers.

39.     At all times relevant to this action, Defendant Henry had the power to hire and fire Salespeople.

40.    On information and belief, Defendant Henry maintains the employment records of Salespeople.

41.    On information and belief, Defendant Gordon directly and indirectly controlled, determined, and directed the day-to-day operations of the CSN Enterprise.

42.    On information and belief, Defendant Gordon directly and indirectly determined the payroll and compensation practices for the CSN Enterprise.

43.    For example, Defendant Gordon was responsible for the practice of classifying Salespeople as independent contractors for purposes of payroll.

44.    Defendant Gordon determined the commission rates paid to Salespeople.

45.    Defendant Gordon was responsible for the payroll policy of paying a base amount twice per month regardless of whether that amount met the minimum wage requirement for each week Salespeople worked.

46.    Named Plaintiff, who worked at Defendants' Atlanta offices, received paychecks written from the account of "CLEARSIGNAL NETWORK SOLUTIONS INC. 8591 W LINEBAUGH AVE TAMPA, FL 33625," which were signed by Defendant Gordon.

47.    A true and correct copy of one of Named Plaintiff's paychecks is attached to this complaint as Exhibit F.

48.    On information and belief, Defendant Gordon directly and indirectly determined the scheduling, disciplinary policies, job descriptions, and other employment practices of the CSN Enterprise.

49.    For example, Defendant Gordon required employees to pay late fees if they arrived late to their scheduled shifts.

50.    Defendant Gordon was responsible for the scripts to be used by Salespeople when communicating with customers.

51.    At all times relevant to this action, Defendant Gordon had the power to hire and fire Salespeople.

52.    On information and belief, Defendant Gordon maintains the employment records of Salespeople.

53.    On information and belief, the CSN Enterprise is engaged in the business of selling telecommunications products and services to businesses.

54.    On information and belief, Defendant Henry exercises control over the products and services sold by the CSN Enterprise.

55.    On information and belief, Defendant Gordon exercises control over the products and services sold by the CSN Enterprise.

56.   On information and belief, Defendants CSN, CSN Solutions, Henry, and Gordon are or have been joint employers for the purposes of the FLSA.

### FACTS SHOWING THAT DEFENDANTS MISCLASSIFIED SALESPEOPLE AS INDEPENDENT CONTRACTORS

57.   Named Plaintiff and others similarly situated were Salespeople for Defendants during the last three years prior to the filing of this complaint.

58.   At all times relevant to this action, Defendants labeled Salespeople, including Named Plaintiff and others similarly situated, as "contractors," rather than "employees."

59.   Defendants' classification of Salespeople as contractors did not mirror the economic realities of the relationship that existed between Defendants and Salespeople for the purposes of the FLSA.

60.   At times relevant to this action, Defendants issued a document called, "CLEARSIGNAL NETWORKS, INC. Operations Handbook" to its workers ("Operations Handbook").

61.   A true and correct copy of the Operations Handbook issued to Named Plaintiff is attached to this complaint as Exhibit G.

62.   With the exception of the payroll and benefits provisions, the Operations Handbook makes few distinctions between employees and independent contractors.

63.     Section 2-01 of the Operations Handbook is entitled "Employment Categories."  Exhibit G at 9.

64.     The Employment Categories listed in the Operations Handbook include, "REGULAR FULL-TIME employees," "INTRODUCTORY employees," and "CONTRACTOR."  Exhibit G at 9.

65.     In the Operations Handbook, Defendants define a REGULAR FULL-TIME employee as, "those who are not in a temporary or introductory status.  They are eligible for the company's benefit package, subject to the terms, conditions, and limitations of each benefit program."  Exhibit G at 9.

66.     In the Operations Handbook, Defendants define a CONTRACTOR as "a person who provides services at CSN and is compensated with a commission plan and limited marginal benefits."  Exhibit G at 9.

67.     The Operations Handbook's provisions apply to both "employees" and "contractors."

68.     The   Operations   Handbook   specifically   addresses "employees/contractors," "employees and contractors," or "employees or contractors," or some mutually inclusive variation thereof, in many provisions.

69.     For example, Section 1-02 of the Operations Handbook is entitled "1-02 Employee and Contractor Relations."  Exhibit G at 7.

70.     By way of further example, Section 1-07, states, "Employees or contractors who improperly use or disclose trade secrets or confidential business information will be subject to disciplinary action, up to and including termination of employment and legal action . . . ."  Exhibit G at 8.

71.     Likewise, in Section 2-02, the Operations Handbook states, "CSN maintains a personnel file on each employees/contactor."  Exhibit G at 9.

72.     Section 4-04 of the Operations Handbook is entitled "Pay Deductions and Setoffs."  Exhibit G at 12.

73.     Section 4-04 specifies that, with regard to "employees" only, Social Security taxes will be deducted, as well as any applicable federal, state and local income taxes.   Exhibit G at 12.

74.     Section 4-04 further explains that "[i]n the event a sale is charge[d] back, CSN will deduct any and all previous commission pay for the charge back sale."  Exhibit G at 12.

75.     According to Defendants' policies, the only distinctions between employees and independent contactors are eligibility for benefits and tax withholding.

76.     Throughout the Operations Handbook, no other material distinctions are made between employees and contractors.

77.     Defendants' policies and practices created an employment relationship between Salespeople and Defendants in which Salespeople were under Defendants' control.

78.     Salespeople's wages were subject to discretionary deductions by Defendants.

79.     Defendants enforced a disciplinary policy with regard to attendance and punctuality that included wage deductions.

80.     For example, if Salespeople were late reporting to work, late fees were deducted from their paychecks.

81.     Likewise, if Salespeople took rest or meal breaks too early in the day, fees were deducted from their paychecks.

82.     The Operations Handbook does not provide notice of potential deductions, or the reasons for which such deductions could be made.

83.     In fact, some deductions were not made pursuant to any stated policy.

84.     Such deductions were made at Defendants' discretion.

85.     Defendants also enforced a litany of policies as stated in Section 6-01 "Employee & Contractor Conduct and Work Rules."  *See* Exhibit G at 14.

86.    These policies covered conduct such as, "boisterous or disruptive activity," "insubordination or other disrespectful conduct," "violation of personnel policies," and "unsatisfactory performance or conduct."  Exhibit G at 14.

87.    Violation of these provisions could result in "disciplinary, up to and including termination of employment/contract."  Exhibit G at 14.

88.    Defendants controlled virtually all of Salespeople's activities, from their work schedules to their sales practices.

89.    For example, Defendants required Salespeople to conduct their work from Defendants' offices.

90.    Named Plaintiff requested authorization to work from home and was denied.

91.    Salespeople had set schedules each week.

92.    Defendants required Salespeople to follow a script when interacting with customers.

93.    Defendants required Salespeople to sell products and services at prices that conformed to Defendants' policies.

94.    Defendants required Salespeople to wear uniforms.

95.    By way of further example, Defendants required Salespeople to use their "customer relationship management" system ("CRM").

96.   CRM is described in the Operations Handbook as a "set of business processes and underlying applications that helps manage all . . . customer information, activities, and conversations."  Exhibit G at 17-18.

97.   Among other employee resources, CRM provided Salespeople with email, calendars, account information, and training materials.

98.   The Operations Handbook describes CRM as "an imperative tool to ensure you receive all information, sales documents and training about all our products and services."  Exhibit G at 19.

99.   Defendants controlled the methods used by Salespeople to perform their job duties.

100.  Defendants' control over Salespeople is indicative of an employer-employee relationship.

101.  Defendants' investment in the operation of its business was many times greater than any investment made by Salespeople.

102.  For example, Defendants operated offices in both Georgia and Florida.

103.  Defendants provided phone service, Internet service, and computers for business use by Salespeople.

104.  Defendants developed and provided CRM for use by Salespeople.

105.   In contrast, Salespeople made virtually no financial investment in their work.

106.   Salespeople occasionally paid for leads with their own money, but such payments were minor investments compared with Defendants' investment.

107.   At all relevant times, Defendants exercised a substantial degree of control over Salespeople's opportunity for profit or loss.

108.   By way of example, at times relevant to this action, Defendants paid Salespeople based on the service sold.

109.   Commissions for certain services, such as Internet and voicemail, were fixed at a flat rate.

110.   By requiring Salespeople to work at certain hours and paying by the number of products and services sold, Defendants restricted the amount of commission Salespeople could earn each day.

111.   Defendants were regularly able to reduce Salespeople's opportunity for profit simply by making pay deductions, such as late fees and charge backs.

112.   For example, if a sale was made, and a customer subsequently canceled the sale, Salespeople's commission would be rescinded.

113.   Therefore, Defendants maintained a high degree of control over Salespeople's opportunity for profit and loss.

114.   The sale of telecommunications products and services does not require any advanced skill or initiative.

115.   No specialized training or education is required for such sales work.

116.   Because the CRM provided Salespeople with all of the specifications for all products and services sold, all knowledge of the products and services could be developed within a few weeks of working for Defendants.

117.   Due to the financial consequences of separating from employment, Defendants pressured Salespeople to maintain employment.

118.   For example, commissions were paid monthly on the 30th of each month, and included compensation for the work performed during the preceding month.

119.   If Salespeople separated from employment, Salespeople's final commission paychecks were to be "processed 90 days after separation of employment," per the Operations Handbook.

120.   However, Salespeople who separated from employment were not paid their full commissions within 90 days or a reasonable time thereafter.

121.   Moreover, Salespeople who separated were not paid the amounts they were actually owed.

122.   Therefore, Salespeople ran the risk of not being paid commissions for several months, if ever, if they separated from employment.

123.   Named Plaintiff and others similarly situated did not do seasonal, temporary, or project-based work for the company.

124.   At all relevant times, Salespeople's work was integral to Defendants' business operations.

125.   Defendants are in the business of selling business-grade telecommunications products and services, including without limitation, business phones and voicemail, digital subscriber lines for Internet and phone service ("DSL"), technical support contracts, and bundles of such services, such as "Business in a Box."

126.   Defendants sell telecommunications products exclusively to businesses.

127.   On information and belief, to ensure that Salespeople conducted only business-to-business transactions, Defendants required customers ordering products and services from residences to provide Employer Identification Numbers issued by the Internal Revenue Service.

128.   According to the Operations Handbook, Defendants act as a "Master Agent" for telecommunications service providers.

129.   Specifically, Defendants act as a Master Agent for AT&T, Inc. and Verizon, Inc. ("Service Providers").

130.   On information and belief, Defendants were authorized to renew service contracts, sell new service contracts, and sell products on behalf of Service Providers, pursuant to an agreement between Defendants and Service Providers.

131.   Salespeople conducted sales of telecommunications products and services.

132.   Salespeople's jobs are, therefore, integral to Defendants' business.

133.   Consequently, and in spite of the labels Defendants applied to Salespeople, they were employees under the FLSA and not independent contractors.

## COUNT ONE

## DEFENDANTS' WILLFUL FAILURE TO PAY SALESPEOPLE THE MINIMUM WAGE IN VIOLATION OF THE FLSA

134.   Salespeople performed thousands of hours of work for Defendants over the three years prior to the filing of this complaint.

135.   During times relevant to this action, Salespeople were scheduled to work full-time during weekdays.

136.   During times relevant to this action, Salespeople also performed work on weekend days.

137.   During times relevant to this action, Salespeople worked in excess of 40 hours per week.

138.   Defendants, however, did not maintain accurate time records.

139.   For example, Defendants failed to track any hours worked by Salespeople for several months after opening its Georgia Office.

140.   Defendants eventually imposed timekeeping requirements, but continued their failure to maintain accurate records by allowing Salespeople to work off the clock.

141.   At times relevant to this action, Salespeople were scheduled to receive $500.00 on the 15th and 30th of every month, regardless of how many hours they worked per week.

142.   The $500.00 payment was subject to deductions by Defendants for policy violations.

143.   The $500.00 payment was docked at Defendants' discretion.

144.   Named Plaintiff routinely received less than the full $500.00 payment.

145.   Defendants also docked such payments to others similarly situated.

146.   At times relevant to this action, Salespeople were paid sales commissions.

147.  With regard to the commissions paid to Salespeople, such commissions were paid commissions every thirty (30) days, one month after sales were made.

148.  At times relevant to this action, commissions were paid based on different variables, including, but not limited to, the product and the term of the contract.

149.  At times relevant to this action, Defendants changed certain payroll policies.

150.  For example, in early 2012, Defendants began to pay Salespeople $10.00 per hour for up to 30 scheduled hours of work per week.

151.  At the same time, however, Defendants imposed new sales requirements on Salespeople.

152.  If Salespeople did not satisfy their sales requirements, they did not receive any commissions.

153.  At times relevant to this action, commissions were subject to deductions, called "charge backs," as set forth in the Operations Handbook.

154.  Defendants deducted amounts classified as charge backs for a variety of reasons, including, but not limited to, the customer's cancellation of the order,

the Service Provider's failure to pay Defendants, or incorrect reporting during the sales reconciliation process.

155.   Salespeople were unable to confirm the validity of many charge backs because they were not allowed to verify the accuracy of the reconciliation reports.

156.   Salespeople were, however, required to complete spreadsheets each week that described their sales.

157.   On the day the spreadsheets were due, Salespeople could not leave Defendants' offices until the spreadsheets were completed.

158.   Despite reconciling their individual sales on a weekly basis, Salespeople were not paid commissions until 30 days after end of the month during which sales were made.

159.   Further, Salespeople did not learn of the charge backs until their commissions were paid.

160.   Similarly, Salespeople were not allowed to verify whether a Service Provider had properly paid Defendants for sales made by Salespeople.

161.   At all relevant times, Salespeople were not paid the full value of their earned commissions.

162.   At all relevant times, Salespeople were not paid the full value of their earned commissions within a reasonable time after commissions were earned.

163.  Defendants' payroll practices with respect to commissions cannot be justified because of the nature of the sales made or by the difficulty in identifying commissions with particular workweeks.

164.  Defendants' payroll practices with respect to commissions were unreasonably burdensome on Salespeople, who were entitled to receive their wages free and clear.

165.  During times relevant to this action, Salespeople did not receive the minimum wage as required by the FLSA.

166.  Defendants' failure to pay Salespeople the minimum wage was willful and without legal basis.

167.  Defendants failed to pay Salespeople the minimum wage despite the employer-employee relationship that existed between Defendants and Salespeople.

168.  As Salespeople, Named Plaintiff and others similarly situated were, at all relevant times, employees rather than independent contractors under the FLSA.

169.  Therefore, Named Plaintiff and others similarly situated are not exempt from the FLSA's minimum wage provisions.

170.  Defendants were required to pay Named Plaintiff and others similarly situated the minimum wage pursuant to 29 U.S.C. § 206(a).

171.   Defendants' attempt to evade paying the minimum wage by classifying Named Plaintiff and others similarly situated as independent contractors was without legal basis.

172.   Defendants' attempt to evade paying the minimum wage by classifying Named Plaintiff and others similarly situated independent contractors was a willful violation of the FLSA within the meaning of 29 U.S.C. § 255.

173.   Defendants' practice of paying $500.00 to Salespeople on the 15th and 30th of every month regardless of hours worked violated the minimum wage requirements of the FLSA.

174.   Pursuant to 29 U.S.C. § 216(b), Defendants are jointly and severally liable to Named Plaintiff and others similarly situated for three years of unpaid minimum wages, an equal amount as liquidated damages, and reasonable attorney's fees.

## <u>COUNT TWO</u>

**DEFENDANTS' WILLFUL FAILURE TO PAY SALESPEOPLE FOR ALL HOURS WORKED IN EXCESS OF 40 PER WEEK AT THE REQUIRED OVERTIME RATE IN VIOLATION OF THE FLSA**

175.   Salespeople performed thousands of hours of work for Defendants over the three years prior to the filing of this complaint.

176.   Salespeople worked in excess of 40 hours per week, including hours worked off the clock.

177.   For example, during times relevant to this action, Named Plaintiff began working prior to his 9:30 a.m. start time and/or continued to work after his shift ended at 4:00 p.m.

178.   During times relevant to this action, Named Plaintiff worked until 6:00 p.m. or later in order to place calls to customers in other time zones.

179.   Because corporate customers were typically more accessible after the close of the business day, Named Plaintiff continued to make sales calls into the evening in order to reach such customers after business hours.

180.   Moreover, when working beyond his scheduled shift, Named Plaintiff was sometimes the last person to leave the office.

181.   On such occasions, Named Plaintiff was instructed by his supervisor to close and lock the office.

182.   However, Named Plaintiff was not compensated for hours spent working after his supervisors left the office at the required overtime rate.

183.   By way of further example, Named Plaintiff also researched and developed sales leads before and after his scheduled work hours.

184.   Named Plaintiff regularly worked more than 40 hours per week.

185.   Named Plaintiff was not properly paid for hours worked before and after his scheduled shift.

186.   Others similarly situated were also subject to the same terms and conditions of employment.

187.   Others similarly situated were also incentivized to stay late or otherwise work off the clock in order to make sales.

188.   On information and belief, others similarly situated routinely worked in excess of 40 hours per week.

189.   Named Plaintiff and others similarly situated are not exempt from the FLSA's overtime wage provisions as independent contractors.

190.   Defendants were required to pay Named Plaintiff and others similarly situated at an overtime rate of not less than one and one half times their regular rate pursuant to 29 U.S.C. § 207.

191.   Defendants violated the FLSA by failing to maintain accurate time records for Named Plaintiff and others similarly situated.

192.   Defendants' attempt to evade paying the required overtime rate by classifying Named Plaintiff and others similarly situated as independent contractors was without legal basis.

193.   Defendants' attempt to evade paying the required overtime rate by classifying Named Plaintiff and others similarly situated as independent contractors was a willful violation of the FLSA within the meaning of 29 U.S.C. § 255.

194.   The $500.00 payments, or portions thereof, made to Named Plaintiff and others similarly situated do not constitute wages for the purposes of the FLSA's overtime provisions.

195.   Pursuant to 29 U.S.C. § 216(b), Defendants are jointly and severally liable to Named Plaintiff and others similarly situated for three years of unpaid overtime wages, an equal amount as liquidated damages, and reasonable attorney's fees.

## PRAYER FOR RELIEF

WHEREFORE, Named Plaintiff Gregory Sweet, of behalf of himself and others similarly situated, prays that:

– The Court certify this action as a collective action pursuant to the FLSA;

– The Court enter judgment in favor of Named Plaintiff and others similarly situated who opt into this action;

– The Court enter judgment against Defendants that their violations of the FLSA were willful;

– The Court award all unpaid wages owed to Named Plaintiff and others similarly situated who opt into this action;

– The Court award liquidated damages in an amount equal to the amount of all unpaid wages to Named Plaintiff and others similarly situated who opt into this action;

– The Court award Named Plaintiff and others similarly situated who opt into this action the attorneys' fees and litigation costs incurred in prosecuting these claims as provided for under the FLSA; and

– The Court grant the Named Plaintiff and all other others similarly situated who opt into this action all other relief as the Court deems just and proper.

## **JURY DEMAND**

Pursuant to Fed.R.Civ.P. 38(b), Named Plaintiff Gregory Sweet, on behalf of himself and others similarly situated, demands a trial by jury.


Respectfully submitted:   July 13, 2012.

|  |  |
|---|---|
|  | s/John L. Mays |
| MAYS & KERR LLC | John L. Mays, Esq. |
| 229 Peachtree Street | Georgia Bar No. 986574 |
| International Tower \| Suite 980 | |
| Atlanta, Georgia 30303 | s/Jeff Kerr |
| Telephone:  (404) 410-7998 | Jeff Kerr, Esq. |
| Facsimile:   (404) 855-4066 | Georgia Bar No. 634260 |
| john@maysandkerr.com | |
| jeff@maysandkerr.com | Attorneys for Plaintiff |

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to LR 5.1(C), NDGa., the undersigned certify that the foregoing

**COMPLAINT** is typewritten using Times New Roman font, 14-point type.


Respectfully submitted:   July 13, 2012.

<table>
<tr><td></td><td>s/John L. Mays</td></tr>
<tr><td>MAYS & KERR LLC</td><td>John L. Mays, Esq.</td></tr>
<tr><td>229 Peachtree Street</td><td>Georgia Bar No. 986574</td></tr>
<tr><td>International Tower | Suite 980</td><td></td></tr>
<tr><td>Atlanta, Georgia 30303</td><td>s/Jeff Kerr</td></tr>
<tr><td>Telephone:  (404) 410-7998</td><td>Jeff Kerr, Esq.</td></tr>
<tr><td>Facsimile:   (404) 855-4066</td><td>Georgia Bar No. 634260</td></tr>
<tr><td>john@maysandkerr.com</td><td></td></tr>
<tr><td>jeff@maysandkerr.com</td><td>Attorneys for Plaintiff</td></tr>
</table>